**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MICHIGAN**

**In re:**

**Summit Street Development Company, LLC,**

      Debtor.

_____/

Case No. 14-07339
Chapter 11
Hon. John T. Gregg

**DEBTOR'S AMENDED COMBINED**
**PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT**

**PREPARED BY**:

Ryan D. Heilman (P63952)
WOLFSON BOLTON PLLC
Attorneys for Debtor
3150 Livernois, Ste. 275
Troy, Michigan 48083
(248) 247-7070
rheilman@wolfsonbolton.com


      **DEBTOR EXPRESSLY RESERVES ITS RIGHT TO AMEND THIS PLAN AND THE DISCLOSURE STATEMENT.**

## DEBTOR'S CHAPTER 11 PLAN

## ARTICLE I
### DEFINITIONS, RULES OF
### INTERPRETATION AND COMPUTATION OF TIME

**1.1** **Scope of Definitions.**

Any term used in this Plan that is not defined herein, but is defined in the Disclosure Statement, the Bankruptcy Code, or the Bankruptcy Rules, will have the meaning given that term in the Disclosure Statement, the Bankruptcy Code, or the Bankruptcy Rules.

**1.2** **Definitions.**

1.2.1 "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estate and operating the business of Debtor, including wages, salaries, commissions for services rendered after the Petition Date, Professional Claims, all fees and charges assessed against the Estate under chapter 123 of title 28, United States Code, taxes accruing after the Petition Date, whether or not the last payment date is before or after the Confirmation Date, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c) of the Bankruptcy Code, provided, however, that this term does not include any portion of Allowed Secured Claims, whether or not all or part of Allowed Secured Claim is entitled to priority under sections 503(b), 507, 363, or 364 of the Bankruptcy Code or otherwise.

1.2.2 "**Administrative Claims Bar Date**" means the deadline for filing proofs of or requests for payment of Administrative Claims, which shall be 45 days after the Effective Date.

1.2.3 "**Affiliates**" has the meaning given it by section 101(2) of the Bankruptcy Code.

1.2.4 "**Allowed Claim**" means a Claim or any portion of the Claim,

a. that has been Allowed by a Final Order of the Bankruptcy Court (or such other court or forum with jurisdiction to adjudicate the Claim and objections to it);

b. as to which a Proof of Claim has been timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code, but only to the extent that the Claim is identified in the Proof of Claim in a liquidated and noncontingent amount, and either (i) no objection to its allowance has been Filed within the periods of limitation fixed by this Plan, the Bankruptcy Code, or by any order of the Bankruptcy Court, or (ii) any objection as to its allowance has been settled or withdrawn or has been denied or overruled by a Final Order;

c. as to which no Proof of Claim has been Filed with the Bankruptcy Court and (i) which is Scheduled as liquidated in an amount other than zero and not contingent or disputed, but solely to the extent of the liquidated amount and (ii) no objection to its

allowance has been Filed by Debtor, within the periods of limitation fixed by this Plan, the Bankruptcy Code, or by any order of the Bankruptcy Court; or

        d.      that is expressly Allowed in a liquidated amount in this Plan.

1.2.5 "**Allowed Class . . . Claim**" or "**Allowed Class ... Interest**" means an Allowed Claim or an Allowed Interest in the specified Class.

1.2.6 "**Allowed Interest**" means an ownership Interest in Debtor, which has been or is later listed by Debtor in its books and records as liquidated in an amount and not disputed or contingent.

1.2.7 "**Avoidance Actions**" means Causes of Action or defenses arising under any of sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation has been commenced as of the Confirmation Date to prosecute the Causes of Action.

1.2.8 "**Ballot**" means each of the ballot forms that is distributed with the Disclosure Statement to Holders of Claims and Interests included in Classes that are Impaired under this Plan and entitled to vote under the terms of this Plan.

1.2.9 "**Bank**" means Wolverine Bank.

1.2.10 "**Bank Debt**" means the debt owed to the Bank as of the Petition Date, plus any postpetition interest accrued under the Cash Collateral Order but unpaid as of the Effective Date, plus any unpaid reasonable costs and attorneys' fees incurred by Bank postpetition relating to Bank's Claims in this Chapter 11 Case.

1.2.11 "**Bank Debt Documents**" means the note, loan agreement, security agreement, mortgage, and all other documents that evidence the Bank Debt and security for the Bank Debt.

1.2.12 "**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date.

1.2.13 "**Bankruptcy Court**" or "**Court**" means the United States Bankruptcy Court for the Western District Michigan, or such other court that may have jurisdiction over the Chapter 11 Case.

1.2.14 "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as applicable to the Chapter 11 Case or proceedings in the Chapter 11 Case, and the Local Rules of the Bankruptcy Court.

1.2.15 "**Bar Date**" means the deadlines set, or to be set, by the Bankruptcy Court for filing proofs of claim or Administrative Claims in the Chapter 11 Case. If the Bankruptcy Court has not set an applicable Bar Date as of the Effective Date, the Bar Date shall be 45 days after the Effective Date.

1.2.16 "**Business Day**" means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in Grand Rapids, Michigan.

1.2.17 "**Cash**" means legal tender of the United States of America and equivalents thereof.

1.2.18 "**Cash Collateral Order**" means the Final Order Authorizing Debtor to Use Cash Collateral and Authorizing Adequate Protection [Docket No. 33].

1.2.19 "**Causes of Action**" means any and all actions, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise, including Avoidance Actions, unless otherwise released by Debtor to the extent the Cause of Action is a Cause of Action held by Debtor.

1.2.20 "**Chapter 11 Case**" or "**Case**" means this chapter 11 case number 14-07339, currently pending in the United States Bankruptcy Court for the Western District of Michigan.

1.2.21 "**Claim**" means a claim against Debtor, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

1.2.22 "**Class**" means a category of Holders of Claims or Interests as described in Article III of this Plan.

1.2.23 "**Confirmation**" means the entry of a Confirmation Order on the docket of the Chapter 11 Cases.

1.2.24 "**Confirmation Date**" means the date of entry of the Confirmation Order.

1.2.25 "**Confirmation Hearing**" means the hearing before the Bankruptcy Court held under section 1128 of the Bankruptcy Code to consider Confirmation of this Plan and related matters, as may be adjourned or continued from time to time.

1.2.26 "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code.

1.2.27 **Contribution Payments**" means the payments made, and to be made, by H, Inc. and Harry H. Hepler to support Debtor's operations during this Chapter 11 Case and after the Effective Date, and to cover any deficiency in Plan Payments.

1.2.28 "**Creditor**" means any creditor of Debtor as defined in section 101(10) of the Bankruptcy Code. For the avoidance of doubt, any Person that accepts a payment from Debtor under this Plan is a Creditor and shall be bound by the terms of this Plan.

1.2.29 "**Debtor**" means Summit Street Development Company, LLC and, after the Effective Date, the Reorganized Debtor.

{00047085.DOCX }

4

1.2.30  "**DIP Loan**" means the postpetition Debtor-in-Possession financing provided by Motor Wheel Lofts, LLC and H, Inc., in the amount of $123,520.

1.2.31  "**Disallowed Claim**" means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law.

1.2.32  "**Disclosure Statement**" means the written disclosure statement (including all attached and referenced exhibits and schedules) that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time, all as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017.

1.2.33  "**Disputed Claim**" or "**Disputed Interest**" means a Claim or any portion thereof, or an Interest or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, nor an Allowed Interest nor a Disallowed Interest.

1.2.34  "**Effective Date**" means the first Business Day of the first month after the Confirmation Date.

1.2.35  "**Entity**" has the meaning set forth at section 101(15) of the Bankruptcy Code.

1.2.36  "**Equity Interest Holders**" means the members of Debtor: Harry H. Hepler and Barbara J. Hepler.

1.2.37  "**Estate**" means the bankruptcy estate of Debtor created pursuant to section 541 of the Bankruptcy Code.

1.2.38  "**Event of Default**" means a default specified in Article IV that has not been waived by the Bank or timely cured by the Reorganized Debtor.

1.2.39  "**File**" means to file with the Bankruptcy Court in the Chapter 11 Cases or such other court with jurisdiction over the relevant subject matter.

1.2.40  "**Final Decree**" means a decree under Bankruptcy Rule 3022.

1.2.41  "**Final Order**" means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely Filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was

sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

1.2.42  "**General Unsecured Claim**" means any Claim that is not otherwise an Administrative Claim or Secured Claim.

1.2.43  The "**Unsecured Claim Payment Period**" means the two-year period during which the Reorganized Debtor shall make payments to the General Unsecured Creditors under this Plan.

1.2.44  "**Governmental Unit**" has the meaning set forth at section 101(27) of the Bankruptcy Code.

1.2.45  "**Ground Lease**" means a long-term lease by Debtor of part or all of its undeveloped property (including parking lots) to a tenant intending to construct improvements on the Property.

1.2.46  "**Ground Lease Subordination Payment**" means the payment to the Bank required under Article IV to permit a Ground Lease tenant to obtain construction financing with priority over the Bank's Lien.

1.2.47  "**H, Inc.**" is a corporation owned and controlled by Harry H. Hepler, the Holder of 86.669% of Debtor's Equity Interests.

1.2.48  "**Holder**" means a Person holding a Claim, Interest, or Lien.

1.2.49  "**Impaired**" refers to any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.2.50  "**Insider**" has the meaning set forth at section 101(31) of the Bankruptcy Code.

1.2.51  "**Insider Action**" means all Causes of Action that the Debtor may have against any Insider or Affiliate.

1.2.52  "**Insider Claim**" means a Claim held by an Insider or Affiliate, but not including Administrative Claims held by HS arising out of the ordinary course of business between Debtor and HS, nor any rights of any Insider to unpaid post-petition compensation.

1.2.53  "**Interest**" means the legal, equitable, contractual, and other rights of any Person with respect to equity securities of, or ownership interests in Debtor.

1.2.54  "**Interest Rate**" except as otherwise provided in the Plan, means the annual rate of interest accruing on Claims, which is set at (a) with respect to a claim for taxes, the interest rate applicable under non-bankruptcy law, (b) for all other Claim Holders entitled to interest under the Bankruptcy Code and this Plan that has not filed an objection to the Interest Rate, 4.5 percent (approximately 3.0% above the Treasury Bill rate as of the date this Plan is Filed), and (c) for all other Claim Holders entitled to interest under the Bankruptcy Code and this Plan that have filed an objection to this Interest Rate, such rate as determined by the Bankruptcy Court upon stipulation of the parties or after a hearing.

1.2.55 "**Lien**" has the meaning set forth at section 101(37) of the Bankruptcy Code.

1.2.56 "**Michigan Litigation**" means the litigation by Debtor against the State of Michigan arising from the State of Michigan's termination of its lease agreement with Debtor, as more fully described in the Disclosure Statement.

1.2.57 "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

1.2.58 "**Petition Date**" means November 21, 2014, the date Debtor filed its Petition for relief in the Bankruptcy Court.

1.2.59 "**Plan**" means this plan for the resolution of outstanding Claims and Equity Interests in the Chapter 11 Case, including any Exhibits, either in its present form or as it may be altered, amended, or modified in accordance with the Bankruptcy Code and Bankruptcy Rules.

1.2.60 "**Plan Payments**" means the payments to Creditors and Administrative Claim Holders required under the terms of this Plan.

1.2.61 "**Plan Term**" means the period commencing on the Effective Date and ending on the earlier of (a) the first Business Day after the fifth anniversary of the Effective Date, or (b) the date the Reorganized Debtor has fully satisfied all its obligations to Creditors under this Plan.

1.2.62 "**Priority Claim**" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

1.2.63 "**Proof of Claim**" means a proof of Claim Filed against Debtor in the Chapter 11 Case.

1.2.64 "**Pro Rata**" means (a) with respect to Claims, at any time, the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes, unless this Plan provides otherwise and (b) with respect to Interests, at any time, the proportion that the number of Interests held by an Interest Holder in a particular Class or Classes bears to the aggregate number of all Interests (including Disputed Interests, but excluding Disallowed Interests) in such Class or Classes.

1.2.65 "**Professional**" means any Person retained in the Chapter 11 Cases by Bankruptcy Court order pursuant to §§ 327 and 1103 of the Bankruptcy Code or otherwise.

1.2.66 "**Professional Claim**" means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and before and including the Effective Date.

1.2.67 "**Property**" means the real property owned by Debtor consisting of an office building located at 700 May Street in Lansing, Michigan, along with contingent parking lots and vacant land, together with all improvements and associated leases and contracts.

1.2.68 "**Purchaser**" means the successful purchaser at a Section 363 Sale, if a Section 363 Sale is held, as set forth in Article IV.

1.2.69 "**Reorganized Debtor**" means Debtor from and after the Effective Date. All references to Debtor shall include the Reorganized Debtor for all times on and after the Effective Date.

1.2.70 "**Restricted Account**" means funds held by Debtor in an interest bearing restricted cash collateral account at Bank.

1.2.71 "**Retained Actions**" means all Causes of Action which Debtor or Debtor's Estate may hold against any Person, including, without limitation, Causes of Action brought before the Effective Date or identified in the Schedules or Disclosure Statement, other than Causes of Action explicitly released under this Plan or by Final Order of the Bankruptcy Court before the date of this Plan.

1.2.72 "**Scheduled**" means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

1.2.73 "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs Filed in the Chapter 11 Case by Debtor.

1.2.74 "**Section 363 Sale**" means the sale of part or all of Debtor's assets under § 363 of the Bankruptcy Code.

1.2.75 "**Secured Claim**" means a Claim secured by a security interest in or a lien on property in which Debtor's Estate has an interest or that is subject to setoff under § 553 of the Bankruptcy Code, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of such Creditor's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by a Final Order of the Bankruptcy Court pursuant to § 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to § 553 of the Bankruptcy Code, or as otherwise agreed upon in writing by Debtor and the Holder of such Claim.

1.2.76 "**Special Distributions**" means distributions of proceeds from the Michigan Litigation, any Section 363 Sale, and any Ground Lease Subordination Payment.

1.2.77 "**Unimpaired**" means, with respect to a Claim, any Claim that is not Impaired.

1.2.78 "**Voting Deadline**" means the deadline set for the receipt of Ballots by Debtor or Debtor's agent under an applicable order entered or to be entered by the Bankruptcy Court.

1.3    **Rules of Interpretation:**  For purposes of this Plan, unless otherwise provided herein:

1.3.1    Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, includes both the singular and the plural.

1.3.2    Each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter.

1.3.3    Any reference in this Plan to an existing document or schedule Filed or to be Filed means the document or schedule, as it may have been or may be amended, modified, or supplemented. Except as otherwise ordered by the Bankruptcy Court, all Exhibits, as amended, modified or supplemented, are incorporated by reference into this Plan and Disclosure Statement for all purposes.

1.3.4    Any reference to an Entity or Person as a Holder of a Claim or Interest includes that Entity's or Person's successors and assigns. Any reference to Debtor includes the Reorganized Debtor for all periods after the Effective Date.

1.3.5    Any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the document shall be substantially on such terms and conditions.

1.3.6    Subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan will be governed by, and construed and enforced in accordance with, the Bankruptcy Code and Bankruptcy Rules. To the extent that reference to state law is required, the Plan is governed by the substantive law of Michigan.

1.3.7    The rules of construction in section 102 of the Bankruptcy Code apply. The Disclosure Statement may be used as an aid for interpretation of this Plan to the extent that any provision of this Plan is determined to be vague or ambiguous. However, to the extent any statement in the Disclosure Statement conflicts with any provision of this Plan, this Plan controls.

1.4    **Computation of Time.**  In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006 apply. Whenever any action is required to be performed or deadline expires on a specific date, if the date falls on a Saturday, Sunday, or legal holiday (as defined in Bankruptcy Rule 9006), the action may be performed, or the deadline will expire, on the next day that is not a Saturday, Sunday, or legal holiday.

1.5    **References to Monetary Figures**.   All references in this Plan to monetary figures refer to currency of the United States of America.

1.6    **Exhibits**.  All Exhibits are incorporated into and are a part of this Plan and Disclosure Statement as if set forth in full herein and, to the extent not attached to this Plan, the Exhibits shall be filed with the Bankruptcy Court, and Debtor shall serve the Exhibits on all Creditors and parties-in-interest. Upon its filing, the Exhibit may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours or at the Bankruptcy Court's website for a fee at https://ecf.miwb.uscourts.gov. The Exhibits may also be requested in writing from Debtor's counsel. **All Exhibits may be revised before the Confirmation Date by the filing of the revised Exhibits with the Bankruptcy Court so long as the revised Exhibits are substantially in conformance with the terms of this Plan and served on all affected Creditors and parties-in-interest.**  The Exhibits are an integral part of the Plan, and

entry of the Confirmation Order by the Bankruptcy Court will constitute an approval of the Exhibits.

      1.7    **Estimates of Claims**.  Unless expressly stated otherwise, nothing herein will be deemed to be an admission by Debtor or to otherwise prejudice Debtor in any claims objection or Cause of Action.  All estimates of Causes of Action and Claim amounts listed in this Plan, the Disclosure Statement, and Exhibits are current estimates only.  All Claims amounts and classifications remain subject to the Claims Objection process as set forth in Article XII.

**ARTICLE II**
**CLAIMANTS THAT ARE NOT SUBJECT TO**
**CLASSIFICATION AND ARE NOT ENTITLED TO VOTE ON THE PLAN**
**ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS**

    2.1 **Administrative Claims**.

      Subject to the provisions of this Plan, as soon as possible after an Administrative Claim becomes an Allowed Administrative Claim or the date when an Administrative Claim becomes payable by law or pursuant to any agreement between Debtor and the Holder of such Administrative Claim (but, in no event later than ten days thereafter), a Holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim or such other treatment that Debtor and the Holder of the Allowed Administrative Claim shall have agreed upon in writing; provided, however, that Administrative Claims incurred by Debtor in the ordinary course of business during the Chapter 11 Cases or arising under contracts assumed during the Chapter 11 Cases prior to, on, or as of the Effective Date will be deemed Allowed Administrative Claims and paid by Debtor in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto; provided further that any cure payments associated with the assumed contracts will be determined in accordance with Article XI if the contracts are not rejected by Article XI of the Plan.

    2.2 **Professional Claims**.

      2.2.1 **Final Fee Applications.** All final requests for payment of Professional Claims must be Filed no later than forty-five days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, Professional Claims and expenses will be determined by the Bankruptcy Court and paid by Debtor promptly after they are Allowed by Final Order.

      2.2.2 **Post-Confirmation Date Retention.** Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date or to make any disclosures pursuant to Bankruptcy Rules 2014 and 2016 will terminate, and Debtor shall employ and pay Professionals in the ordinary course of business.

    2.3    **Substantial Contribution Compensation and Expenses Bar Date.** Any Person who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application with the clerk of the Bankruptcy Court on or before

{00047085.DOCX  }

the Administrative Claims Bar Date and serve such application on counsel for Debtor and other parties as may be directed by the Bankruptcy Court on or before such date, or be forever barred from seeking such compensation or expense reimbursement. The Court will determine any timely filed request for compensation or expense reimbursement made under this section 2.4, and Debtor shall pay any Allowed amount within forty-five days of entry of a Final Order.

2.4 **DIP Loan and Other Insider Administrative Claims.**, The DIP Loan will be a non-interest bearing loan until the Effective Date, and Debtor shall make no payment on account of the DIP Loan except as set forth in this Plan. Commencing on the Effective Date, the DIP Loan will accrue interest at the Interest Rate. Nothwithstanding the above, the DIP Loan and any other Administrative Claims unpaid as of the Effective Date that are held by Equity Interest Holders, or Insiders and Affiliates of Debtor or Equity Interest Holders, will be fully subordinated to all other Claims treated in this Plan, and on account of which no repayment shall be made until the Reorganized Debtor has fully satisfied all its obligations under this Plan (other than Class II Claims owed to Equity Interest Holders or their Insiders and Affiliates).

2.5 **Other Administrative Claims**. All other requests for payment of an Administrative Claim (other than as set forth in sections 2.2 through 2.4 of this Plan) must be Filed and served on Debtor's counsel by the Administrative Claims Bar Date, except that any Administrative Claim not already Filed and required to have been Filed before a Bar Date is automatically disallowed. Any request for payment of an Administrative Claim pursuant to this section 2.6 that is not timely Filed and served is automatically disallowed without the need for any objection by Debtor. After the Effective Date, Debtor may settle an Administrative Claim without further Bankruptcy Court approval. Unless Debtor objects to an Administrative Claim within 60 days after the Administrative Claims Bar Date (unless such objection period is extended by the Bankruptcy Court), the Administrative Claim will be deemed Allowed in the amount requested. In the event that Debtor objects to an Administrative Claim, the Bankruptcy Court will determine the Allowed amount of the Administrative Claim.

## ARTICLE III

## SPECIFICATION OF TREATMENT OF CLASSES OF CLAIMS OR INTERESTS <u>NOT IMPAIRED UNDER THE PLAN AND THOSE IMPAIRED UNDER THE PLAN</u>

The Plan divides Claims and Interests into four Classes and treats them as follows:

3.1 **Class I**:  Class I consists of the Bank Debt.

3.1.1.   The Bank Debt is an Allowed Secured Claim in the amount of $4,710,129.65, plus any postpetition interest accrued under the Cash Collateral Order but unpaid as of the Effective Date, plus any unpaid reasonable costs and attorneys' fees incurred by Bank postpetition relating to Bank's Claims in this Chapter 11 Case.

3.1.2.   Bank Debt will be deemed fully secured under section 506(a) of the Bankruptcy Code.

3.1.3.   Commencing on the Effective Date, Reorganized Debtor will make monthly payments of interest for the first year of the Plan Term and monthly payments of principal and interest throughout the remainder of the five-year Plan Term. Monthly payments during the Plan Term shall be calculated based on amortizing the Bank Debt over 25 years with interest accruing at the Interest Rate.

3.1.4.    On or before the fifth anniversary of the Effective Date, Reorganized Debtor will make a balloon payment equal to all remaining principal and interest, thereby satisfying the Bank Debt in full.

3.1.5.    The Reorganized Debtor may pre-pay all or any portion of the Bank Debt at any time without penalty. Any partial pre-payment shall be applied to the principal amount of the Bank Debt, but shall not affect the amount of the monthly payments or the Reorganized Debtor's obligation to continue making monthly payments until the Bank Debt has been paid in full.

3.1.6.    Except as set forth in Article IV, below, until full satisfaction of the Bank Debt, the Bank will retain its Liens on all property of Debtor on which the Bank had a valid prepetition or postpetition Lien, to secure the Bank Debt, the Bank's Liens will maintain the same priority, validity, and enforceability as existed immediately before the Petition Date or as set forth in any order of the Bankruptcy Court.

3.1.7.    Bank is hereby granted a Lien, as of the Effective Date, on Debtor's interests in Parcel 009 (a parcel adjacent to the Property which is not owned by Debtor but as to which Debtor has possessory interests under a license with the City of Lansing). Debtor shall reasonably cooperate with Bank to properly record this Lien.

3.1.8.    Until full satisfaction of the Bank Debt, Debtor shall continue to (a) make monthly tax escrow payments to the Bank in an amount sufficient to pay Debtor's property taxes as they become due, and (b) maintain and insure the Property as required under the Bank Loan Documents.

3.1.9.    **This Class is Impaired**.

3.2    **Class II:**    Class II consists of all Allowed General Unsecured Claims.

3.2.1    Debtor has scheduled General Unsecured Claims in the amount of $385,644.90.

3.2.2    Class II Claims shall accrue interest at the Interest Rate commencing on the Effective Date and continuing until the Claim has been fully satisfied.

3.2.3    Except for Claims held by the Equity Interest Holders and Insiders and Affiliates of the Debtor or Equity Interest Holders, Holders of Class II Claims will be paid 100% of their Allowed General Unsecured Claims, payable in five annual installments as follows:

A.    The first annual payment will be made on or before sixty days after the Effective Date, and each subsequent annual payment will be made on the same date thereafter.

B.    Each annual payment to a Class II Claim Holder shall be in the amount of 20% of the Claim, plus all interest accrued but unpaid as of the date the payment is made. For purposes of this section, a payment is made on the day when a valid check is placed in the mail or given to a courier service for delivery to the Creditor's last known address with correct postage or fees prepaid. Otherwise, payment is made on the day when the Creditor receives the payment.

3.2.4    Allowed General Unsecured Claims held by the Equity Interest Holders and Insiders and Affiliates of the Debtor or Equity Interest Holders shall be subordinated in priority and timing of payment to all other Claims treated under this Plan, and no amount shall be paid on account of such Claims until all Debtor's other

3.2.5    **This Class is Impaired**.

3.3    **Class III**: This Class consists of the Claims of the Equity Interest Holders.

3.3.1    The Interests of this Class will be treated in one of two alternative methods:

A.    If Class II votes to accept the Plan, the Holders of Class III Claims of Interests will retain their Interests.  **This Class will not be Impaired.**

B.    If Class II votes to reject the Plan and the Plan is nonetheless Confirmed, the Interests of Debtor will be canceled and the Interests of the Reorganized Debtor will be sold at an auction pursuant to procedures proposed by Debtor and subject to Bankruptcy Court approval, and the proceeds shall be distributed Pro Rata first on account of Administrative Claims and next to Holders of Class II Claims. The Purchaser must apply all revenues of the Reorganized Debtor to satisfy all of the obligations of the Reorganized Debtor as and when set forth in this Plan, and the Purchaser, and any individual that owns or controls the Purchaser, directly or indirectly, assumes personal liability for all such obligations. **This Class will be Impaired.**

## ARTICLE IV
## EXECUTION AND IMPLEMENTATION OF THE PLAN

4.1    **The Reorganized Debtor**:  Upon the Effective Date, Debtor will become the Reorganized Debtor. The Reorganized Debtor shall continue operating Debtor's business and shall distribute all income as provided under the terms of this Plan.

4.2    **Post-Confirmation Liability and Financing**:

4.2.1    **Liability for Plan Payments.** Debtor and Reorganized Debtor shall be responsible for satisfying the Allowed Claims in accordance with the terms and provisions of this Plan.

4.2.2    **Responsibility for Post-Confirmation Operations.** The Reorganized Debtor will retain control of and be responsible for all of Debtor's operations after the Effective Date. Funding for the operations of Debtor's business and for distributions required under this Plan during the Plan Term shall be from the revenues of the Reorganized Debtor's business operations and, if applicable, the Contribution Payments.

4.2.3    **Post-Confirmation Financing.** Debtor reasonably believes that future operations and the Contribution Payments will enable the Reorganized Debtor to satisfy its obligations under the Plan. Other sources of cash may be explored and utilized by the Reorganized Debtor to the extent that such infusions are necessary or helpful to meet the obligations under the Plan or to facilitate continued operations, which may include exit financing, subordinated financing, capital contributions and/or lending from Insiders to Debtor. Debtor shall be entitled to enter into financing arrangements and to execute financing documents after the Effective Date without

providing notice or obtaining Bankruptcy Court approval, provided that, until the Bank Debt has been paid in full, Debtor shall not permit any Liens to be filed against the Property except with Bank's consent or with respect to a Ground Lease as set forth below. Notwithstanding the above, the Reorganized Debtor may grant first-priority Liens on the Property if the Reorganized Debtor uses the proceeds of the transaction to fully satisfy the Bank Debt.

              4.2.4   **Restrictions on Financing Arrangements with Insiders.** Debtor may borrow from Affiliates or Insiders after the Confirmation Date and repay the amounts borrowed from Debtor's revenues *only* if Debtor (a) adequately protects all Creditors and parties-in-interest, and (b) obtains either Bank's written consent or approval from the Bankruptcy Court after notice and a hearing. Otherwise, Debtor shall make no payments to the Equity Interest Holders or any Affiliate or Insider of the Equity Interest Holders until all other Plan Payments have been satisfied. Any financing that becomes effective before the Effective Date will be subject to Bankruptcy Court approval after notice and opportunity for a hearing. Notwithstanding the above, until all payments required by this Plan have been made in full, the Reorganized Debtor shall not agree to pay interest to the Equity Interest Holders or any Insider or Affiliate of Debtor for any loan or contribution, and the Reorganized Debtor shall not provide loans or contributions to any Insider or Affiliate.

              4.2.5   **Pre-payments.** The Reorganized Debtor may pre-pay any Claim in whole or in part, other than Claims held by Insiders or Affiliates (which may only be pre-paid after all other Plan payments have been made in full), at any time without penalty or liability for unmatured interest. The Reorganized Debtor may negotiate discounts in exchange for pre-payments. Upon payment by the Reorganized Debtor to any Creditor in the amounts required under this Plan or as otherwise agreed by the Creditor, the Reorganized Debtor will have no further obligation to the Creditor under this Plan, and the Creditor will have no further or continued rights or standing under this Plan.

              4.2.6   **Release from Plan Obligations Upon Satisfaction of Plan Payments.** Upon satisfaction of all obligations to all Creditors, the Reorganized Debtor will no longer be bound by the provisions of this Plan and will be entitled to conduct its business without Bankruptcy Court supervision under applicable non-bankruptcy law. Nothing in this Section shall be construed as waiving or limiting the Reorganized Debtor's rights and interests under this Plan, to enforce those rights and interests through the Bankruptcy Court, to dispute claims, to bring motions or pursue Causes of Action in the Bankruptcy Court or any other court, or to petition the Bankruptcy Court for the redress of any grievances.

          4.3   **Professional Fees:**  Any services performed or expenses incurred by any Professional on behalf of Debtor with respect to the Chapter 11 Case after the Confirmation Date will be Administrative Claims, will be paid by Debtor and will not be subject to the prior review and approval of the Bankruptcy Court. Notwithstanding any provision of the Bankruptcy Code or Rules, including, without limitation, Bankruptcy Rule 2016, after the Confirmation Date, no Professional will be required to disclose payments from Debtor to the Bankruptcy Court or the United States Trustee. All fees and expenses of Debtor shall be billed directly to Debtor and the Bankruptcy Court shall review only that portion to which Debtor objects. Debtor must pay the portion not objected to in accordance with the terms of the invoice.

          4.4   **Effectuating Documents**:  The Debtor and its authorized representatives are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and to take such actions as may be necessary or appropriate on behalf of Debtor to effectuate and further evidence the terms and conditions of this Plan without further notice to or order, action or approval of the Bankruptcy Court.

{00047085.DOCX }

4.5 **Preservation of Rights of Action**:

4.5.1 **Vesting of Causes of Action:** In accordance with section 1123(b) of the Bankruptcy Code, all Causes of Action of Debtor and Debtor's Estate will be transferred to the Reorganized Debtor. Except to the extent waived and released under this Plan, the Reorganized Debtor shall retain and may (but is not required to) enforce all rights to commence, pursue, compromise and collect, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including, but not limited to, Avoidance Actions and any actions specifically listed in the Disclosure Statement.

4.5.2 **All Causes of Action are Specifically Reserved, whether or not specifically listed in the Plan or Disclosure Statement:** Unless any Causes of Action are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, an Exhibit, or a Final Order, Debtor specifically reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, res judicata, estoppel (judicial, equitable or otherwise) or laches will apply to any of the Causes of Action upon, after or as a consequence of Plan Confirmation, entry of the Confirmation Order, or the Effective Date.

4.6 **The Restricted Account:** The first $500,000 of funds in the Restricted Account are to be are to be restricted as set forth below and may be used *only* for the following purposes:

4.6.1 The Restricted Account may be used for tenant improvements in connection with a lease for a new tenant or expansion of space for an existing tenant.

a. Bank shall have a first-position lien on the rents generated by the new or modified lease.

b. All rents from a new lease, or all additional rents from a modified lease for expanded space, shall be deposited directly into the Restricted Account until the Restricted Account has been replenished to a minimum account balance of $500,000.

c. The lease is reasonably certain to generate sufficient revenues to replenish the Restricted Account to $500,000 in no less than three years from the date the cash is withdrawn from the account.

4.6.2 Only to the extent that the Restricted Account balance is greater than $500,000 and will remain greater than $300,000 after the proposed draw, funds from the Restricted Account may also be used for capital improvements on Debtor's property that increase the value of Debtor's property by an amount greater than or substantially equivalent to the amount drawn from the Restricted Account. If the draw decreases the Restricted Account to an amount below $500,000, Debtor will make equal monthly payments into the Restricted Account such that the Restricted Account will be fully replenished within 18 months from the draw.

4.6.3 Only to the extent that the Restricted Account balance is, and remains, greater than $500,000, Debtor may use funds in the Restricted Account to pay Debtor's operating expenses (but not to fund Plan Payments).

{00047085.DOCX }

15

4.7    **Section 363 Sales**: Debtor may sell substantially all Property only if the Bank's Debt is fully satisfied through the transaction. Debtor may subdivide the Property and seek Bank's consent or Bankruptcy Court authorization to sell any portion of the Property free and clear of the Bank's mortgage and Liens. Absent Bank consent, such authorization shall be granted only if Debtor satisfies the requirements under § 363 of the Bankruptcy Code, including providing the Bank with adequate protection of its interests in the Property. In addition to any other adequate protection requirements that may be imposed by the Bankruptcy Court after notice and a hearing, all of the following conditions are met:

4.7.1    The sale price is no less than the appraised value of the property to be sold as set forth in a new appraisal to be obtained by Debtor after the after the date of this Plan from an appraiser chosen by Debtor and acceptable to Bank (provided that Debtor shall consult with Bank prior to choosing the appraiser and Bank shall not unreasonably withhold acceptance).

4.7.2    Debtor pays Bank, as an early principal payment, a percentage of the proceeds sufficient to ensure that the total loan to value ratio after the sale will be equal or less than the loan to value ratio immediately before the sale. By way of example, if the Bank Debt equals $4.7 million and the appraised value of all the collateral is $9.4 million, the loan to value ration equals 50%. Thus, Debtor must pre-pay a sufficient amount to Bank to ensure that the loan to value ratio does not exceed 50% after the sale transaction.

4.7.3    All sale proceeds retained by Debtor shall be placed in the Restricted Account, shall constitute additional collateral for the Bank Debt, and may be used by Debtor only as set forth in Section 4.6.

4.7.4    The proposed sale will not substantially impair the value of Bank's other collateral.

4.8    **Ground Lease Option.** Debtor may enter into a long-term Ground Lease of Debtor's undeveloped Property (including parking lots) to facilitate construction of improvements with Bank's consent or on the following conditions:

4.8.1    Annual rent is a minimum of 10% of the appraised value of the leased property, and the ground lease requires the tenant to pay all costs associated with the leased property.

4.8.2    In the event of an Event of Default, as set forth below, the tenant will pay the rent directly to Bank.

4.8.3    Debtor's Ground Lease tenant may obtain construction financing with a first priority lien on any improvements, provided that Debtor provides adequate protection of Bank's interest in the Property, including (a) payment at least equal to that required under Section 4.7.2 had the Property been sold, (b) the construction mortgage is no more than 80% loan to value, (c) the construction mortgage is on otherwise commercially reasonable terms, and (d) the proposed construction will not substantially impair the value of Bank's other collateral.

4.9    **State of Michigan Litigation Proceeds.** Debtor shall distribute any proceeds from the Michigan Litigation (whether from settlement of judgment) as follows:

4.9.1    Bank shall have a first-priority Lien on the Michigan Litigation and its proceeds except to the extent they represent commercial tort claims or proceeds of commercial

16

tort claims, and except that any applicable attorney's Lien s shall have such priority as provided by applicable non-bankruptcy law.

      4.9.2   The first Litigation Proceeds will be used to pay all incurred but unpaid costs and expenses of the Michigan Litigation, including attorneys' fees and expert witness costs.

      4.9.3   Debtor, in its discretion, may place up to $300,000 of the Litigation Proceeds in the Restricted Account.

      4.9.4   Fifty percent of all remaining Michigan Litigation proceeds shall be distributed to Bank as an early principal payment, and fifty percent shall be retained by Debtor.

4.10   **The Contribution Payments**:

      4.10.1  Since the Petition Date Harry Hepler, through his related entities Motor Wheel Lofts, LLC and H, Inc., has contributed $123,520 to fund Debtor's continued operations, tax escrow payments, and interest payments to the Bank.

      4.10.2  Additionally, Mr. Hepler has agreed to continue supporting Debtor's on-going operations to the extent necessary, including funding any deficiency of Plan Payments and operating expenses to the extent such payments and expenses cannot be funded from Debtor's revenues. These payments are essential to the Debtor's reorganization.

4.11   **No Impact on Validity of Guaranties; Moratorium on Enforcement.** Nothing in this Plan shall in any fashion be deemed to affect the validity of any of guaranties of the Bank Debt. However, notwithstanding any guaranty, so long as no Event of Default has occurred under the terms of this Plan, Bank shall not pursue its guaranty claims against Harry H. Hepler. Bank, in its discretion, may dismiss the current action against Mr. Hepler without prejudice, or may petition the court to hold the action in abeyance and dismiss the action with prejudice upon payment in full of Debtor's obligations to Bank. Bank may resume enforcement of Mr. Hepler's guaranty if an Event of Default occurs as set forth below.

4.12   **Events of Default and Remedies.**

      4.12.1  **Defaults.** The occurrence of any of the following events shall constitute a default under the Plan:

     A.     The failure of Debtor to timely make a payment to Bank as required under the Plan or any other material breach of the provisions of the Plan;

     B.     The failure of Debtor to maintain insurance on the real property;

     C.     The failure of Debtor to pay Property taxes in a timely manner;

     D.     The failure of Debtor to maintain the Property in good condition and repair;

     E.     The failure of Debtor to provide Bank with any report or information required under this Plan or to fail to provide Bank with

any other reasonably requested information within twenty-one days of such request;

F.     The entry of an order pursuant to 11 U.S.C. § 362, granting any entity other than Bank relief from the automatic stay if the granting of such relief substantially impairs the value of the Bank's collateral;

G.     The appointment of a Trustee under 11 U.S.C. § 1104, unless such appointed is requested by Bank; and

H.     Lien Filings that materially impair the value of Bank's collateral.

4.12.2  **Cure Period.** Upon the occurrence of an default, Bank may file a Notice with the Court describing the default which has occurred ("Notice of Default"). Upon such filing, Bank shall send a copy of the Notice of Default via regular mail to Debtor's counsel, Debtor, and any other party requesting notice. Debtor shall have 30 days to cure the first such default, but only ten days to cure any subsequent default.

4.12.3  **Event of Default.** It shall be an Event of Default if Bank files an affidavit with the Bankruptcy Court indicating that a default has occurred and has not been waived in writing by Bank or cured within the applicable cure period. Debtor may seek an emergency determination by the Court that a default has not occurred, was waived in writing by Bank, or was timely cured. If Debtor's bankruptcy estate has been closed, Debtor may seek to reopen the bankruptcy estate for the purpose of contesting the occurrence of an Event of Default, or may contest the occurrence of an Event of Default in any other court with competent jurisdiction.

4.12.4  **Relief from Stay.** Upon the occurrence of any Event of Default, Bank shall be entitled to relief from stay and may exercise its rights under applicable non-bankruptcy law.

4.13  **Reports and Information Requests.**

4.13.1  Debtor shall provide Bank with the following periodic reports:

A.     Copies of any insurance policy renewal or new insurance policy and/or other indicia of other insurance listing the Bank as lost payee;

B.     Copies of all new leases, lease renewals, and other contracts or commitments with any current or prospective tenants, including descriptions of any tenant improvements to be paid by Debtor; and

C.     Such other reports and information as Bank may, from time to time reasonably request.

4.13.2  Debtor shall permit Bank or its representatives, appraisers, accountants, or other professionals and experts upon reasonable request to inspect the business premises and/or the books of the Debtor, provided that any such inspection shall be conducted during normal business hours and with no interruption to Debtor's business.

4.13.3  Although Bank may require reports on Debtor's marketing efforts and progress in negotiations with prospective tenants or Purchasers, notwithstanding any other

requirements in this Plan, Debtor shall not be required to provide Bank with names of prospective tenants or Purchasers during the marketing and negotiation phases of the tenant acquisition or sale process. This provision is not intended to prejudice any of Bank's rights set forth in this Plan or any of its rights with respect to any subordination and non-disturbance agreement requested by a prospective tenant.

## ARTICLE V
## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

5.1    **Discharge of Indebtedness**:

5.1.1    Except as otherwise provided in this Plan, the Confirmation of this Plan will, and does hereby act to discharge and release the Claims of all Creditors against Debtor and the Reorganized Debtor, the same constituting a full, total and complete settlement with the Creditors. Confirmation will also act as a merger and relinquishment of any and all Claims that Creditors have, or may have, against Debtor and the Reorganized Debtor as provided in the treatment of the Creditors in Articles II and III. The forgoing notwithstanding, this paragraph will not affect the rights of any taxing authority against any other entity or person who may be liable or responsible for the taxes of the Reorganized Debtor.

5.2    **Subordinated Claims**:  If a Claim is Allowed but subordinated, the Claim will not be entitled to payment under this Plan until the Reorganized Debtor has satisfied all its obligations under this Plan with respect to Claims with priority.

5.3    **Injunction**:  Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all Creditors and any other Persons that have held, currently hold, or may hold Claims or Interests that are treated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against Debtor or its property on account of any such discharged Claims, debts, liabilities, or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to Debtor; and (v) commencing or continuing any action in any manner, in any place that does not comply, or is consistent, with the provisions of this Plan.

5.4    **Protections against Discriminatory Treatment**:  Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons, including Governmental Units, shall not discriminate against Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, Debtor, or other Person with whom Debtor has been associated, solely because Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before Debtor is granted or denied a discharge), or has not paid a debt that may be modifiable in the Chapter 11 Case.

5.5    **Release of Liens**:  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Articles II and III of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate will be deemed fully released and discharged, and all of the right,

title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests will revert to Debtor and its successors and assigns.

## ARTICLE VI
## PROVISIONS GOVERNING DISTRIBUTION

6.1    **Delivery of Distributions in General**: Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Allowed Interests will be made by Debtor (a) at the addresses set forth on the Proofs of Claim Filed by the Holders of Claims or Interests (or at the last known addresses of such Holders of Claims or Interests if no Proof of Claim is Filed or if Debtor has been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to Debtor after the date of any related Proof of Claim, (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and Debtor has not received a written notice of a change of address, or (d) at the address of any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Distributions under the Plan on account of Allowed Claims will not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim will have and receive the benefit of the distributions in the manner set forth in the Plan.

6.2    **Undeliverable Distributions and Non-Negotiated Checks**: If any distribution to a Holder of a Claim or Interest is returned as undeliverable, no further distributions to such Holder of such Claim or Interest will be made unless and until Debtor is notified of the then-current address of such Holder of the Claim, at which time all missed distributions will be made to the Holder of the Claim without interest. Checks issued by the Reorganized Debtor on account of Claims that are not negotiated within one hundred and twenty days after the issuance of the check will be null and void. Amounts in respect to undeliverable distributions and non-negotiated checks will be held by the Reorganized Debtor until the earlier of (i) such distributions are claimed by the valid Holder of the Claim or (ii) ninety days after the check is returned or voided due to non-negotiation, after which date all such undistributed and non-negotiated amounts will revert to the Reorganized Debtor free of any restrictions and the Claim of any Holder or successor to such Holder with respect to the distribution will be deemed discharged and forever barred, notwithstanding federal or state escheat laws to the contrary. Nothing contained herein requires the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim.

6.3    **Fractional Payments.** Notwithstanding any other provision of the Plan to the contrary, payments of fractions of dollars are not required. Payment of fractions of dollars that would otherwise be distributed under the Plan will be rounded to the lower whole number of dollars.

6.4    **Restrictions on Distributions.** Notwithstanding anything in this Plan to the contrary, Debtor is not required to make any distribution to a Creditor in an amount less than $5.00.

## ARTICLE VII
## MODIFICATION OF THE PLAN

7.1    **Modification of Plan.** Except as otherwise provided in this Plan, Debtor may, from time to time, propose amendments or modifications to this Plan prior to the Confirmation Date, without leave of the Bankruptcy Court. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions

{00047085.DOCX  }

on modification set forth in the Plan, Debtor expressly reserves its rights to revoke or withdraw, or to alter, amend or modify materially the Plan, one or more times before the Confirmation Date. After the Confirmation Date, Debtor may, with leave of the Bankruptcy Court and upon notice and opportunity for hearing to the affected Creditor(s), remedy any defect or omission, reconcile any inconsistencies in the Plan or in the Confirmation Order, or otherwise modify the Plan. Debtor may also seek to modify the Plan by proposing a Confirmation Order that contains Plan modifications.

7.2    **Effect of Confirmation on Modifications**.  Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation of the Plan are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

7.3    **Revocation or Withdrawal of the Plan.**  Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans. If Debtor revokes or withdraws the Plan, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption, assignment, or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, will be deemed null and void; and (3) nothing contained in the Plan will: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the right of Debtor or any other Person; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by Debtor or any other Person.

## ARTICLE VIII
## JURISDICTION OF THE COURT

8.1    **Jurisdiction**.  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including without limitation, jurisdiction with respect to:

8.1.1    The classification of the Claim of any Creditor and the re-examination of Claims Allowed for purposes of voting, and the determination of such objections as may be filed to Claims of Creditors.  The failure by Debtor to object to, or to examine any Claim for the purposes of voting, will not be deemed to be a waiver of any right to object to, or reexamine the Claim, in whole or in part. Furthermore, the fact that this Plan has provided a treatment for the benefit of a particular Creditor will not in any way be deemed to be a waiver of any right to object to or re-examine the Claim or any secured interest whether by mortgage or otherwise which secures such Claim, in whole or in part.

8.1.2    The determination of all questions and disputes regarding title to the assets of the estate, and all causes of action, controversies, disputes, or conflicts, whether or not subject to action pending as of the Confirmation Date, between Debtor and any other party.

8.1.3    The correction of any defect, the curing of any omission or the reconciliation of any inconsistency in this Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of this Plan.

8.1.4    The enforcement and interpretation of the terms and conditions of this Plan and the entry of orders in aid of confirmation of this Plan.

8.1.5    The entry of any order, including injunctions, necessary to enforce the title, rights, and powers of Debtor or any party-in-interest, and to impose such limitations, restrictions, terms and conditions of such title, rights and powers as this Court may deem necessary.

8.1.6    The review and approval of all Professional Fee applications for services rendered before the Confirmation Date and the review of any Professional Fees for services rendered in connection with the Plan after the Confirmation Date to the extent that Debtor disputes all or a portion thereof.

8.1.7    Debtor's, Reorganized Debtor's, and the Litigation Agent's right to pursue Causes of Action, including any Avoidance Actions.

8.1.8    The entry of any order authorizing a Section 363 Sale by Reorganized Debtor.

8.1.9    The determination of whether an Event of Default has occurred and enforcement of Bank's rights under this Plan after an Event of Default.

8.1.10  The entry of an order determining the validity of any Lien.

8.1.11  The entry of an order concluding and terminating this Case.

**ARTICLE IX**
**TITLE TO PROPERTY**

9.1.    **Revesting of Assets**.  Except as otherwise explicitly provided for in this Plan, on the Effective Date, all property held by the Estate (including all Causes of Action) will vest in the Reorganized Debtor free and clear of all Claims, Liens, charges, encumbrances, right, and Interests of Creditors and equity security Holders. As of and following the Effective Date, the Reorganized Debtor, as provided for under the terms of this Plan, may operate Debtor's business and use, acquire, and dispose of property and settle and compromise Claims or Interests without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan and the Confirmation Order.

**ARTICLE X**
**UNITED STATES TRUSTEE FEES & REGULATORY COMPLIANCE**

10.1    **Payment of U.S. Trustee Fees**.  Debtor shall pay to the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) and shall provide the United States Trustee with appropriate reports indicating the cash disbursements for the relevant period until such time as the Chapter 11 Case is closed. If the Case is closed and subsequently reopened, Debtor shall file reports and pay the appropriate fees for the period during which the Case is reopened.

## ARTICLE XI
## EXECUTORY CONTRACTS

11.1     **Assumption of Executory Contracts and Unexpired Leases.**  Unless subject to a separate motion to assume or reject filed before the Confirmation Date, all executory contracts and unexpired leases of Debtor shall be deemed assumed. Notwithstanding the above, all rights and Claims of Insiders and Affiliates of Debtor to cure payments are subordinated to Class I and Class II non-Insider Claims and shall not be paid until Reorganized Debtor has satisfied all its obligations under this Plan to non-Insiders.

11.2     **Rejection Claims.**   Any Creditor who has a Claim as a result of the rejection of a contract shall have thirty days after receipt of Debtor's request to reject the contract to file a Proof of Claim, failing which such Claim will be disallowed in its entirety.

11.3     **Objections to Rejection Claims and Cure Claims.**  Debtor may file an objection to any Proof of Claim filed in accordance with this Article and in accordance with Article XII.

11.4     **Determination of Executory Contract and Cure Amounts**: In the event of any dispute, Reorganized Debtor or any Creditor may bring a motion before this Court at any time seeking a determination that any particular contract or lease has or has not been assumed by operation of this Article, and, if assumed, the amount required to cure any default.

## ARTICLE XII
## OBJECTIONS TO CLAIMS

12.1.    **Timing of Objections:**   Debtor may object to the allowance of any Claim, whether listed on the Schedules filed by Debtor, or filed by any Creditor, on or before the later of (a) sixty days from the date of filing of any Proof of Claim or (b) six months after the Effective Date.

12.2     **Objections to Liens:**  Debtor may object to any Lien (including objections to the extent, validity, perfection and enforcement of any mortgage, assignment of rents or security interest)  within the time period set forth in Section 12.1 or after any attempt by a Creditor to enforce the Lien.

12.3     **Claims Bar Date**:  Except as provided herein or otherwise agreed by Debtor in writing, any and all Proofs of Claim filed after the applicable Bar Date shall be deemed disallowed and expunged as of the Effective Date (or, for a Claims Bar Date after the Effective Date, as of the applicable Claims Bar Date) without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Proofs of Claim, unless on or before the Confirmation Date such late Claim has been held timely Filed by a Final Order.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.1     **Immediate Binding Effect**.   Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon Debtor, Reorganized Debtor, any Purchaser, and any and all Holders of Claims and Interests (irrespective of whether any such Holders of Claims or Interests failed to vote to accept or reject the Plan, voted to accept or reject the Plan, or is deemed to accept or reject the Plan), and all Persons that are

{00047085.DOCX }

23

parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan.

13.2    **Additional Documents**.  On or before the Effective Date, Debtor may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Debtor and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

13.3    **Reservation of Rights**. Except as expressly set forth in the Plan, the Plan will have no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by Debtor with respect to the Plan or the Disclosure Statement shall be, or shall be deemed to be, an admission or waiver of any rights of Debtor with respect to the Holders of Claims or Interests before the Effective Date.

13.4    **Successors and Assigns**. The rights, benefits, and obligations of any Person named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of such Person.

13.5    **Service of Documents**.  After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to Debtor or Reorganized Debtor must be sent by overnight mail, postage prepaid to:

Stephen A. Purchase
700 May Street
Lansing, Michigan  48906
*with a copy to:*

Ryan D. Heilman
**WOLFSON BOLTON PLLC**
3150 Livernois, Suite 275
Troy, Michigan  48083.

13.6    **Entire Agreement.** Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and the Plan Exhibits.

13.7    **Severability of Plan Provisions**. If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted, unless Debtor, Reorganized Debtor, or a Creditor whose interests or rights are impaired by the judicial determination files a written objection with the Court within fourteen days, or within such other time as set by order of the Court. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired,

or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without Debtor's consent; and (3) nonseverable and mutually dependent.

   13.8   **Closing of Chapter 11 Cases**.  Debtor shall, after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

   13.9   **Waiver or Estoppel**. Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with Debtor or any other Person, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

   13.10  **Conflicts and Interpretation of the Plan**. Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, or any order (other than the Confirmation Order) referenced in the Plan (or any Exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan will govern and control.

   13.11  **Termination of Liens and Encumbrances**.  Debtor and all parties-in-interest, including any Creditor, must execute any document reasonably requested by the other to memorialize and effectuate the terms and conditions of this Plan. This includes the execution by Creditors of any Uniform Commercial Code terminations and releases. Debtor is expressly authorized to file any termination statement to release a Lien which is either discharged or satisfied as a result of this Plan or any payments made in accordance with the Plan.

   13.12  **Limitations on Operations**.  If the Reorganized Debtor has made all payments and distributions required under this Plan, all restrictions, negative covenants, and other limitations on Debtor's operations provided herein or in the Confirmation Order will terminate.

   13.13  **Causes of Action; Standing**.  Except as otherwise provided in this Plan, Debtor has the right and authority to commence, continue, amend or compromise all Causes of Action available to Debtor, the Estate or the debtor-in-possession, including without limitation all Avoidance Actions whether or not those Causes of Action or Avoidance Actions were the subject of a suit as of the Confirmation Date.

   [Remainder of page intentionally left blank]

**DISCLOSURE STATEMENT**

**I.**    **Introduction and Overview.**

**A.**    **Purpose of Disclosure Statement.**

All capitalized terms in this Disclosure Statement have the meaning given them in Debtor's Plan of Reorganization (the "Plan") unless the terms are defined in this Disclosure Statement.

Debtor submits this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code to all known Holders of Claims against it. Debtor has filed the Plan with the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, a copy of which accompanies this Disclosure Statement.

Debtor provides this Disclosure Statement to its Creditors to disclose information material and necessary for Creditors to make a reasonably informed decision in exercising their right to vote to accept of the Plan.

**B.**    **Source of Information.**

The Disclosure Statement and the Plan have been prepared from information furnished primarily by Debtor. Debtor's counsel and financial advisors have not conducted an independent investigation to verify this information.

Certain materials contained in this Disclosure Statement are summaries of the Plan, motions and orders entered in this Chapter 11 Case, or other documents. While every effort has been made to retain the meaning of these documents or portions of documents that have been summarized, Debtor urges you to thoroughly review the contents of these documents before relying on them. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of the document will govern. *If this Disclosure Statement conflicts in any way with the Plan, the terms of the Plan will govern.*

The statements contained in this Disclosure Statement are made as of its date, unless another time is specified. Neither the delivery of this Disclosure Statement nor any exchange of rights in connection with it will, under any circumstances, create an implication that there has been no change of the facts set forth in this Disclosure Statement since the date of it.

**NO PERSON OR ENTITY HAS BEEN AUTHORIZED BY DEBTOR OR THE COURT TO GIVE ANY INSTRUCTIONS OR MAKE ANY REPRESENTATIONS CONCERNING DEBTOR, DEBTOR'S FINANCIAL AFFAIRS, OR THE VALUE OF ITS PROPERTY, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN. ANY REPRESENTATIONS, PROMISES OR INDUCEMENTS, PARTICULARLY REGARDING DEBTOR'S PROPERTY OR FUTURE INCOME, MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN, WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION. ANY SUCH REPRESENTATION, INDUCEMENTS AND/OR PROMISES SHOULD BE REPORTED TO COUNSEL FOR DEBTOR WHO, IN TURN, SHALL INFORM THE COURT.**

C.    **Overview of Chapter 11.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and equity interest holders. In addition to permitting a rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets. The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor-in-possession.

The consummation of a plan of reorganization is the principal objective in a Chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to limited exceptions, the confirmation order discharges a debtor from any debt that arose before the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, § 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. Debtor is submitting this Disclosure Statement to Holders of Claims against, and equity Interests in, Debtor to satisfy the requirements of § 1125 of the Bankruptcy Code.

II.    **Description of Debtor.**

A.    **The Debtor**

Summit Street Development, L.L.C. is a Michigan limited liability company which operates a commercial office space within the historically adapted Prudden Tech Centre in the City of Lansing, County of Ingham, State of Michigan.  The facility includes approximately 124,000 square feet of leasable space and 850 parking spaces.  The Debtor has operated the site since 1999, rehabilitating approximately 62,000 square feet of leasable office space, and facilitating parceling the original 22-acre site to facilitate two successful multi-family residential developments.  The current office tenants are C2AE and H Inc. H Inc. has committed to executing a new lease for the white-box space as it is completed. Additionally Gym space will be rented on an hourly or per event basis by Debtor to the Public.

B.    **Principals**

Harry H. Hepler owns 86.67% of the LLC and Barbara Hepler owns the remaining 13.33%. Mr. Hepler is the manager of the Debtor and is involved in its operations on a daily basis.

Mr. Helper also is the majority interest holder and manager of Motor Wheel Lofts, LLC, East Grand River, LLC and H, Inc. Debtor owes these companies $177,105.52, $32,641.92, $68,948.04, respectively, for accommodations and loans made before the Petition Date. The

27

Plan subordinate repayment of these amounts to all non-Insider Claims, and no payments will be made until Reorganized Debtor satisfies all non-Insider Claims in full as required by the Plan. As discussed in IV.B and VI.B, below, H, Inc. manages Debtor's Property and earns 5% of gross rents. This amount has been paid during the Chapter 11 Case and will continue to be paid after Confirmation.

## C.    Primary Causes of Bankruptcy

On January 29, 2014, the Debtor closed on financing with Wolverine with a lending limit of $9,700,000 for the purposes of refinancing existing debt, financing build-outs for a new lease then in full force and effect with the State of Michigan as evidenced by an Estoppel executed at the time, carry out other property improvements and provide the Debtor with access to equity from the property to support future development.

At closing the Debtor drew $5,153,293.06 on the loan: $4,440,000 was allocated to refinance existing debt,  $638,710.76 was placed into an escrow account for payment of real estate commissions due upon the State of Michigan assuming occupancy in the property, and the remaining $74,582.30 to pay for loan fees and closing costs.

On or about April 15, 2014, Wolverine approved Debtor's request for a draw in the amount $200,442.35 for demolition and electrical work related to the State Lease, and the installation of HVAC roof-top units serving other tenants in the building.

Throughout the month of April, the State of Michigan failed to participate in essential construction planning meetings.  On or about April  20, 2015, Debtors primary contact at the State of Michigan stated to Mr. Hepler and Mr. Purchase by telephone that the State Department was experiencing internal turmoil and advising Debtor to continue regular progress updates.  On or about May 5, 2015, Debtor received notice that the State of Michigan would be cancelling its lease effective June 6, 2015.

Wolverine placed Debtor in a state of "Pre-default" on or about May 14, 2015 alleging a material adverse change in Borrower's business, financial condition or the Property,  a belief that the Lender's rights in the Property will soon be impaired, and a belief that Debtor would soon be unable to perform its duties under the Bank Documents.

Debtor made all loan payments in a timely manner and in full.  In October, 2014, Debtor released the commission escrow, returning $638,710.76 to Wolverine, thereby reducing the principal balance to $4,710,129.  Debtor continued to work with Wolverine, providing several plans to guarantee payment over the original term of the loan while facilitating continued investment in the property to attract new tenants and diversify sources of income.

Wolverine signaled its intentions to initiate a lawsuit against the Debtor in the 30th Circuit Court for Ingham County seeking to collect on the Bank Debt.  The Debtor filed this Chapter 11 proceeding on November 21, 2014 to prevent adverse actions from occurring in the State Court, to protect its operations, and to give the Debtor breathing space in which to reorganize its financial affairs.

## IV.    Post-petition events of significance.

The following contains an overview of certain events occurring after the Chapter 11 filing, including the administration of the Chapter 11 case, the stabilization of the Debtor's operations, and the Debtor's restructuring initiatives.

{00047085.DOCX }

**A.      Filing the Chapter 11 Case Petitions**

This case was filed as a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 21, 2014.  The Debtor is authorized to continue to operate its businesses and manage its properties as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request for appointment of a Chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

**B.      Business Continuation; Litigation Stay**

The Debtor's chapter 11 filing immediately gave rise to the Bankruptcy Code's "automatic stay" which, with limited exceptions, enjoined commencement and continuation of all creditor collection efforts, litigation against the Debtor, and enforcement of liens against the Debtor's property. This relief provided the Debtor with "breathing room" to assess and reorganize its businesses. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until the Confirmation Date.

Since the Petition Date, and to a great degree before it, the Debtor has worked to maintain the streamlined operation of its business.  The Debtor contracts with H, Inc. to manage the property and provide in-house maintenance, lawn care, snow removal, and other property management functions to minimize costs to the Debtor.  The Debtor, together with H, Inc., has marketed the property through a variety of brokers and online sources to attract new tenants to the building.

As a result of these efforts, the Debtor continued to meet and even exceed the loan payment obligations of the Bank Loan Documents before the Petition Date, and has been making interest only payments since the Petition Date. However, due to the cancelation of Debtor's lease with the State of Michigan, Debtor's Property is currently under-utilized and has been throughout the Chapter 11 Case. Debtor has funded the shortfall in operating expenses and payments to Wolverine Bank  from entities controlled by Mr. Hepler – Motor Wheel Lofts, LLC ($85,931) and H, Inc. ($37,589.57). To show his commitment and faith in Debtor's continued operations, Mr. Hepler, on behalf of Motor Wheel Lofts, LLC and H, Inc., has agreed to subordinate repayment of these amounts to all non-Insider Claims. Further, Mr. Hepler has agreed to continue funding the shortfall in Debtor's operations and Plan Payments throughout the Plan Term. As shown on Exhibit B, Mr. Hepler's continued support is projected to exceed $880,000 over the Plan Term in the absence of additional revenue sources. If Debtor does obtain additional revenue sources, Debtor will still likely require further support from Mr. Hepler to pay for required broker commissions, tenant improvements, and capital improvements as Debtor's access to the funds in the Restricted Account is controlled by the Plan and is unlikely to fully fund these requirements.

Wolverine has sued Mr. Hepler under a guaranty of the Bank Debt. Because Mr. Hepler's support is critical for success of Debtor's Plan, and because all creditors, including the Bank, will be paid in full with interest under the Plan, **the Plan provides that the guaranty action against Mr. Hepler will be stayed pending satisfaction in full of the Bank Debt or the occurrence of an Event of Default.**

Debtor has seen an increase in inquiries for potential leases.  In fact, the Debtor is now cultivating multiple separate leads including for three separate tenants interested in, 10,000, 20,000 and 30,000 square feet, and a fourth for a multi-year lease of up to 500 parking spaces.

{00047085.DOCX }

In addition, the Debtor has engaged brokers and acted on its own accord to seek alternative financing options that would permit the refinance of the Bank Debt.  Several prospective lenders have been identified has having an interest in lending on the Property, including a lender that has provided a term sheet to refinance 100% of the Bank Debt and provide additional tenant build-out funds contingent on a lease being executed for Suite B.

Following its long standing practice of splitting land for diversification of development—which before lead to the successful Motor Wheel and Prudden Place developments—the Debtor is actively pursuing an opportunity to enter into a land-lease for excess land that is not required to support the existing office development.

**C.     Post-Petition Sales Outside the Ordinary Course of Business**

There have been no significant sales or transfers of property postpetition outside the ordinary course of business.

**D.     Cash Collateral Orders/Adequate Protection Orders**

To date, the Debtor and Wolverine have been able to agree to the consensual use of cash collateral and provision of adequate protection under orders issued by this Court. Debtor has made monthly interest payments on the Bank Debt.

**E.     Litigation**

The Debtor is in the pre-filing phase of initiating litigation against the State of Michigan for Breach of Lease and to that end has secured an independent present-value damages assessment exceeding $8,000,000. Litigation costs will be supported personally by Harry H. Hepler, Debtor's Managing Member.

**V.     Liquidation Analysis and Claims.**

**A.     Debtor's liquidation analyses is attached as Exhibit A.**

**B.     Risks, conditions and assumptions regarding the stated values.**

*See* **Exhibit A**. The stated values and expenses are estimates only and not intended as representations regarding actual recoveries in the event of liquidation. The 2013 CBRE appraisal found a fair market value of Debtor's property of $9,200,000 for the building, as is (as of 2013, at which time the City of Lansing was a tenant, but H, Inc. was not a paying tenant), and $15,050,000 for the building as stabilized. The CBRE appraisal also valued Debtor's excess land at $850,000. Given the loss of the City of Lansing as a tenant on the one hand, and the addition of H, Inc. as a paying tenant and general price appreciation since 2013 on the other hand, Debtor retained the total as is CBRE value of $10,050,000 for purposes of this liquidation analysis. If Debtor obtains an updated appraisal before the Confirmation Date, Debtor will file a summary of the updated appraisal as a supplementary exhibit to this Disclosure Statement. To the extent Debtor is successful in obtaining new tenants, the value of the Property will be increased.

{00047085.DOCX }

**C.      Potential Claims and Causes of Action Including Preference and Fraudulent Conveyance Actions**

The Debtor has not conducted a preference analysis, fraudulent conveyance analysis, or analysis with respect to other avoidance actions or claims objections.  Any creditor who received payment from any one of the Debtor within 90 days prior to the Petition Date may be named as a defendant in a preference action.  The Debtor specifically reserves all rights to pursue any and all claims, causes of actions, avoidance actions, objections to claims, fraudulent conveyance actions or any other type of action.

**VI.      Details regarding implementation of the Plan.**

**A.      Cashflow Projection – Exhibit B**

In order to assist creditors in determining the feasibility of the Plan, a cashflow projection through the end of the Plan Term is attached as Exhibit B.  This includes notations to show how the succeeding years' projections and assumptions vary from the first year of monthly projections. The projections are necessarily based on a variety of estimates and assumptions that may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market, and financial uncertainties and contingencies, many of which will be beyond the Debtor's control.

Debtor has provided a baseline projection, but expects additional new sources of revenue from new tenants and potential property sales or long-term ground leases. Any new leases will also require some additional expenditures, but the nature and amounts of these expenses are too speculative to include in projections at this time. As stated above, the cash flow shortfall that the Debtor projects pending new sources of revenue will be funded by Harry H. Hepler or other entities owned by Mr. Hepler.

**B.      Continuation of Business**

The Debtor will continue operation of its business in its current location.  Harry H. Hepler will continue to manage the day-to-day operations of the businesses.   Mr. Hepler is not currently, and will not after confirmation, directly be compensated from the Reorganized Debtor. Mr. Hepler is the 100% owner of H, Inc., a third-party management company that manages the operations of the Property in return for compensation of 5% of gross rents. This is an industry standard arrangement.

The Debtor may seek to expand or contract its operations postpetition.  Expansion or contraction decisions will be made carefully and after consulting with the Debtor's counsel and the Debtor's financial professionals. The Debtor believes that the Debtor's businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.   Consistent with the Liquidation Analysis described in this Plan and other analyses prepared by the Debtor and its professionals, the value of the Debtor's estate would be considerably greater if the Debtor continues to operate as a going concern instead of liquidating.

In addition to Debtor's on-going attempts to lease space in its building, Debtor is also actively pursuing a two-year lease of up to 500 parking spaces to Sparrow Hospital, which will require Debtor to make capital improvements to the parking lots. Through the course of the Plan Term, Debtor may also subdivide the Property and sell a portion of the Property for its appraised value, including through a parcel split, division of Debtor's building, the creation and sale of

condominium units in Debtor's building, or the sale of some or all of Debtor's vacant land, with the proceeds of any such sale to be distributed as set forth in the Plan. Debtor may also enter into a long-term ground lease, subject to the limitations and requirements of the Plan.

## C.    Tax Ramifications

While the Debtor is contemplating a potential sale of assets, the Debtor has not agreed to any sale and no sale is imminent. Accordingly, this Plan and Disclosure Statement anticipate no capital gains issues. Further, because the Plan requires the payment of all Allowed Claims in full over the course of the Plan Term, Debtor does not expect a significant discharge of indebtedness and anticipates no issues relating to discharge of indebtedness income.

## D.    Claim Discharge and Interest Termination

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or in the Confirmation Order, confirmation of the Plan and the distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Confirmation Date, of all claims and causes of action, whether known or unknown, against, liabilities of, obligations of, rights against, and interests in the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such claims, rights, and interests, including, but not limited to, claims and interests that arose before the Confirmation Date, any liability (including withdrawal liability) to the extent such claims relate to services performed by employees of the Debtor prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Confirmation Date, all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim based upon such claim, debt, right, or interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (b) a claim or interest based upon such claim, debt, right, or interest is allowed under Section 502 of the Bankruptcy Code, or (c) the holder of such a claim, right, or interest accepted the Plan, the Confirmation Order shall be a judicial determination of the discharge of all claims against and interests in the Debtor, subject to the occurrence of the Confirmation Date.

Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all persons that have held, currently hold, or may hold claims or interests that have been discharged or terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Reorganized Debtor or its property on account of any such discharged claims, debts, liabilities, or terminated interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due to the Debtor; and (v) commencing or continuing any action in any manner, in any place that does not comply, or is consistent, with the provisions of the Plan.

## VII.  Statutory requirements for plan confirmation

The following is a brief summary of the plan confirmation process in a proceeding under Chapter 11 of the Bankruptcy Code. Claim and interest holders are encouraged to review the Bankruptcy Code's relevant provisions and to consult their own attorneys.

{00047085.DOCX }

## A.    The Confirmation Hearing

Bankruptcy Code Section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on plan confirmation.  Under Bankruptcy Code Section 1128(b), any party in interest may object to plan confirmation.  The Court in this case will enter an order setting the confirmation hearing date. The Bankruptcy Court may adjourn the confirmation hearing from time to time without further notice except by announcing the adjournment date at the confirmation hearing or at any subsequent adjourned confirmation hearing.

## B.    Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find that, among other things, the requirements of Bankruptcy Code Section 1129 are satisfied. In summary, these requirements include the following:

1. The Plan complies with all applicable Bankruptcy Code provisions.

2. The Debtor has complied with the applicable Bankruptcy Code provisions.

3. The Plan has been proposed in good faith and not by any means forbidden by law.

4. Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the cases, has been disclosed to the Bankruptcy Court, and any such payment made before Plan Confirmation is reasonable, or if such payment is to be fixed after Confirmation, such payment is subject to Bankruptcy Court approval as reasonable.

5. With respect to each class of impaired claims or interests, either each claim or interest holder in such class has accepted the Plan or will receive or retain under the Plan on account of such claim or interest, property of a value, as of the Confirmation Date, not less than the amount such holder would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code.

6. Each class of claims or interests entitled to vote on the Plan either has accepted the Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of each voting class under Bankruptcy Code Section 1129(b).

7. Except to the extent a particular claim holder agrees to different treatment, allowed administrative claims and other allowed priority claims will be fully paid on, or as soon as reasonably practical after, the Confirmation Date.

8. At least one class of impaired claims or interests has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim or interest in such class.

9. Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless the liquidation or reorganization is proposed in the Plan.

10. All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Confirmation Date.

11. The Plan addresses payment of retiree benefits in accordance with Bankruptcy Code Section 1114.

The Debtor believes that the Plan satisfies the requirements of Bankruptcy Code Section 1129, including, without limitation, that (i) the Plan satisfies or will satisfy all of the Bankruptcy Code's statutory requirements; (ii) the Debtor has complied or will have complied with all of the Bankruptcy Code's requirements; and (iii) the Debtor proposed the Plan in good faith.

## C.    Best Interests of Creditors Test

Before it can confirm the Plan, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each class, that each claim or interest holder in such class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan property of a value, as of the Confirmation Date, not less than the amount that such Person would receive or retain if the Debtor liquidated under Chapter 7 of the Bankruptcy Code.

In Chapter 7 liquidation cases, unsecured creditors and interest holders are generally paid from available assets in the following order, with no junior class receiving any payments until all amounts due to senior classes have been fully paid or any such payment is provided for:

- Secured creditors (to the extent of their collateral's value);

- Administrative and other priority creditors;

- Unsecured creditors;

- Debt expressly subordinated by its terms or by Bankruptcy Court order; and

- Equity interest holders.

As described in more detail in the Liquidation Analysis, the Debtor believes that the value of any distributions in a Chapter 7 case would be less than the value of Plan distributions because, among other reasons, distributions in a Chapter 7 case may not occur for a longer period of time, reducing the distributions' present value.  In this regard, it is possible that Chapter 7 distributions could be delayed for a period for a trustee and its professionals to become knowledgeable about the Chapter 11 Case and the claims against the Debtor.  In addition, Chapter 7 distributions are likely to be significantly discounted because of the sale's distressed nature, and because the Chapter 7 trustee's and professionals' fees and expenses would likely exceed those of the Debtor's professionals (further reducing cash available for distribution).

## D.    Financial Feasibility

Before it can confirm the Plan, the Bankruptcy Court must also find that confirmation is not likely to be followed by the Reorganized Debtor's liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. For purposes of showing that the Plan meets this feasibility standard, the Debtor has analyzed the Reorganized Debtor's ability to meet its obligations under the Plan and to retain sufficient liquidity and capital resources to conduct its businesses.

Projections indicate that the Reorganized Debtor should have sufficient cash flow and cash reserves to pay and service their debt obligations and to fund their operations. Accordingly, the Debtor believes that the Plan complies with Bankruptcy Code section 1129(a)'s financial feasibility standard.

## E.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to plan confirmation that, except as described in the following Section, each class of impaired claims or equity interests accept the plan.  A class not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of that claim or interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the claim or interest holder receives cash equal to the allowed amount of its claim or, with respect to any interest, any fixed liquidation preference to which the interest holder is entitled or any fixed price at which the debtor may redeem the security.

## F.    Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a Bankruptcy Court to confirm a plan, even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class.  Bankruptcy Code section 1129(b) states that, notwithstanding an impaired class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests impaired that is impaired under, and has not accepted, the plan.

Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including the effect of applicable subordination agreements between parties. Accordingly, a plan could treat two unsecured-creditor classes differently without unfairly discriminating against either class.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the secured claim holders retain the liens securing their claims for the claims' allowed amount, whether the debtor retains the applicable encumbered property or transfer it to another entity under the plan; and (b) each secured claim holder in the class receives deferred cash payments totaling at least the claims' allowed amount with a present value, as of the plan's effective date, at least equivalent to the value of the secured claimant's interest in the applicable encumbered property.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims requires that either: (a) the plan provides that each claim holder in the class receive or retain property valued, as of the plan's effective date of the plan, equal to the claim's allowed amount; or (b) any claim or interest holder junior to the claims of the class will not receive or retain under the plan any property for the junior claim or equity interest.

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests requires that either: (a) the plan provides that each interest holder in the class receives or retains under the plan property of a value, as of the plan's effective date, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which the interest holder is entitled, (if) any fixed redemption price to which the interest Holder is entitled, or (iii) the

{00047085.DOCX }

35

interest's value; or (b) if the class does not receive such an amount as required under (a), no class of equity-interests junior to the non-accepting class receives a distribution under the plan.

The Plan provides that if any impaired class rejects the Plan, the Debtor reserves the right to seek to Plan confirmation under Bankruptcy Code Section 1129(b)'s "cram down" provisions.  If any impaired class rejects the Plan or is deemed to have rejected the Plan, the Debtor will request Plan confirmation under Bankruptcy Code section 1129(b).  The Debtor reserves the right to alter, amend, modify, revoke or withdraw the Plan or any Plan exhibit or supplement, including for the purpose of satisfying Bankruptcy Code Section 1129(b)'s requirements, if necessary.

## VIII.  <u>Voting instructions</u>

### A.    **Voting Procedures**

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interest, that are impaired under the plan.  Accordingly, classes of claims or interests that are not impaired are <u>not</u> entitled to vote on the plan.

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class.  Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and  should complete and sign each ballot separately.  A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims:  (a) that are listed on the Debtor's Schedules of Assets and Liabilities <u>other</u> than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order).  However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important.  After carefully reviewing the plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the debtor's attorney by the deadline previously established by the court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the debtor's attorney.

### B.    **Acceptance**

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots.  The Bankruptcy Code defines

{00047085.DOCX }

acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots.  If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

**C.    Confirmation**

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan.  These conditions are too numerous and detailed to be fully explained here.  Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these:

1.    Each class of impaired creditors and interest must accept the plan, as described in paragraph VI.B., above.

2.    Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

**D.    Modification**

The debtor reserves the right to modify or withdraw the plan at any time before confirmation.

**E.    Effect of Confirmation**

If the plan is confirmed by the Court:

1.    Its terms are binding on the debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the plan.

2.    Except as provided in the plan:

(a)    In the case of a corporation that is reorganizing and continuing business:

(1)    All claims and interests will be discharged.
(2)    Creditors and shareholders will be prohibited from asserting their claims against or interest in the debtor or its assets.

(b)    In the case of a corporation that is liquidating and not continuing its business:

(1)    Claims and interests will not be discharged.

(2)    Creditors and shareholders will not be prohibited from asserting their claims against or interests in the debtor or its assets.

(c)    In the case of an individual or husband and wife:

(1)     Claims will be discharged, except as provided in 11 U.S.C. §§ 523 and 727(a).

(2)     Creditors will be prohibited from asserting their claims except as to those debts which are not discharged or dischargeable under 11 U.S.C. §§ 523 and 727(a).

Submitted by:                                         Prepared by:
Summit Street Development Company, LLC,               WOLFSON BOLTON PLLC
Debtor


  /s/ Harry H. Hepler                                 By: /s/  Ryan D. Heilman
By: Harry H. Hepler                                   Ryan D. Heilman (P63952)
Its: Managing Member                                  Attorneys for Debtor
                                                      3150 Livernois, Suite 275
                                                      Troy, MI  48083
                                                      Telephone: (248) 247-7070
                                                      Facsimile:  (248) 247-7099
                                                      E-Mail:  rheilman@wolfsonbolton.com


Date: October 22, 2015

# EXHIBIT A – LIQUIDATION ANALYSIS

**Summit Street Development Company, LLC**
**Case No. 14-07339**
**Liquidation Analysis**

**Assuming Fair Market Value of Debtor's Property per 2013 CBRE Appraisal**

| Collateral Description | Creditor Holding Lien | Market Value | Amount of Secured Claim | Creditor's Recovery | Remaining Equity |
|---|---|---|---|---|---|
| Real Property at 700 May Street, Lansing, MI 48906 | Wolverine Bank | $10,050,000 | | | |
| | | less: | | | |
| | | Broker's Fees (10%): $1,005,000 | | | |
| | | Realized Value: $9,045,000 | $4,710,129.65 | $4,710,129.65 | $4,334,870.35 |
| Restricted Cash Collateral Account | Wolverine Bank | $500,729.90 | Satisfied | --- | $500,729.90 |
| Other Personal Property | Wolverine Bank | $177,712 | Satisfied | --- | $177,712 |
| State of Michigan Litigation | Wolverine Bank | Unknown | Satisfied | --- | Full value available to creditors and equity holders |

| | |
|---|---|
| Amount Available to priority and unsecured creditors after payments to secured creditors: | $5,013,313 |
| DIP Loan and Administrative Expense Claims, estimated: | $200,000 |
| General Unsecured Claims: | $385,644.90 |
| Distribution - Administrative and General Unsecured Claim Holders: | **$585,644.90** |

**Summit Street Development Company, LLC**
**Case No. 14-07339**
**Liquidation Analysis**
**Page 2 of 2**

**Assuming Forced Sale Value of Debtor's Property**
Other Assumptions:
* 15 month marketing period per CBRE appraisal
* Due to liquidation and lack of support by Equity Interest Holders, Debtor is unable to maintain operations and loses both current tenants - resulting in a 50% discount to fair market price
* Lack of Equity support also results in failure to pursue the State of Michigan litigation
* Bank must advance funds to cover insurance, property tax, and related expenses

| Collateral Description | Creditor Holding Lien | Forced Sale Value | Amount of Secured Claim | Creditor's Recovery | Remaining Equity |
|---|---|---|---|---|---|
| Real Property at 700 May Street, Lansing, MI 48906 | Wolverine Bank | $5,025,000 | | | |
| | | less: | | | |
| | | Est. protective property tax, maintenance, and insurance payments: | | | |
| | | $290,000 | | | |
| | | Accrued Interest (at 4.5%): | | | |
| | | $264,945 | | | |
| | | Broker's Fees (10%): | $502,500 | | | |
| | | Realized Value: | $3,967,555 | $4,710,129.65 | $3,967,555 | $0 |
| Restricted Cash Collateral Account | Wolverine Bank | $500,729.90 | $742,574.44 | $500,729.90 | $0 |
| Other Personal Property (50% of fair mkt value) | Wolverine Bank | $88,856 | $241,844.54 | $88,856 | $0 |
| State of Michigan Litigation | Wolverine Bank | --- | $152,988.54 | --- | $0 |

| | |
|---|---|
| Secured Creditor Deficiency: | $152,988.54 |
| Amount Available to priority and unsecured creditors after payments to | $0 |
| DIP Loan and Administrative Expense Claims, estimated: | $200,000 |
| General Unsecured Claims: | $385,644.90 |
| Distribution - Administrative and General Unsecured Claim Holders: | **$0** |

# EXHIBIT B –

# FIVE-YEAR FINANCIAL PROJECTIONS

**PRUDDEN TECH CENTRE**
**5-year projections - Land Lease**

| Profit / Loss | | | | |
|---|---|---|---|---|
| | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** |
| **Rental Income** | | | | | |
| C2AE | $ 289,386 | $ 298,067 | $ 307,009 | $ 316,219 | $ 325,706 |
| H Inc. | $ - | $ - | $ - | $ - | $ - |
| Land Lease | $ - | $ - | $ - | $ - | $ - |
| Commercial Parking | $ 66,000 | $ 66,000 | $ 16,500 | $ - | $ - |
| New Tenant (Suite B - 24,040 SF) | $ - | $ - | $ - | $ - | $ - |
| Gym | $ - | $ - | $ - | $ - | $ - |
| **Gross Income** | $ 355,386 | $ 364,067 | $ 323,509 | $ 316,219 | $ 325,706 |
| | | | | | |
| **Expenses** | | | | | |
| Property Management | $ 17,769.28 | $ 18,203.36 | $ 16,175.46 | $ 15,810.97 | $ 16,285.30 |
| Maint & Repairs | $ 4,200 | $ 4,284 | $ 4,370 | $ 4,457 | $ 4,546 |
| Grounds Maintenance | $ 4,600 | $ 4,600 | $ 4,600 | $ 4,600 | $ 4,600 |
| Landscaping | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 |
| Plumbing | $ 720 | $ 734 | $ 749 | $ 764 | $ 779 |
| Bldg Supplies | $ 480 | $ 490 | $ 499 | $ 509 | $ 520 |
| Electricity | $ 16,200 | $ 16,524 | $ 16,854 | $ 17,192 | $ 17,535 |
| Gas | $ 7,155 | $ 6,956 | $ 6,956 | $ 6,956 | $ 6,956 |
| Water/Sewer | $ 6,960 | $ 7,099 | $ 7,241 | $ 7,386 | $ 7,534 |
| Trash Collection | $ 756 | $ 771 | $ 787 | $ 802 | $ 818 |
| Real Estate Tax (Escrowed Monthly) | $ 112,000 | $ 114,240 | $ 116,525 | $ 118,855 | $ 121,232 |
| Fees & Permits | $ 300 | $ 301 | $ 301 | $ 301 | $ 301 |
| Insurance | $ 9,000 | $ 9,180 | $ 9,364 | $ 9,551 | $ 9,742 |
| Accounting | $ 3,000 | $ 3,060 | $ 3,121 | $ 3,184 | $ 3,247 |
| HVAC Repairs | $ 2,100 | $ 2,142 | $ 2,185 | $ 2,229 | $ 2,273 |
| Snow Removal | $ 4,350 | $ 4,368 | $ 4,368 | $ 4,368 | $ 4,368 |
| Pest Control | $ 1,068 | $ 1,089 | $ 1,111 | $ 1,133 | $ 1,156 |
| Roof Repair | $ 1,750 | $ 1,750 | $ 1,750 | $ 1,750 | $ 1,750 |
| Parking Lot Lights (lease, includes power) | $ 17,004 | $ 17,344 | $ 17,691 | $ 18,045 | $ 18,406 |
| Tenant/Client Development | $ 2,400 | $ 2,448 | $ 2,497 | $ 2,547 | $ 2,598 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Gross Expenses** | $ | 213,312 | $ | 217,083 | $ | 218,643 | $ | 221,939 | $ | 226,146 |
| **NET OPERATING INCOME** | $ | 142,073 | $ | 146,984 | $ | 104,866 | $ | 94,281 | $ | 99,560 |

| Debt Service |
|---|

**Wolverine Loan**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Initial Principal Balance | $ | 4,710,130 | $ | 4,710,130 | $ | 4,710,130 | $ | 4,710,130 | $ | 4,710,130 |
| Rate | | 4.50% | | 4.50% | | 4.50% | | 4.50% | | 4.50% |
| Amortization | | 25 | $ | 25 | $ | 25 | $ | 25 | $ | 25 |
| Debt Service | $ | 211,956 | $ | 314,165 | $ | 314,165 | $ | 314,165 | $ | 314,165 |
| Memper/Hepler Contributions | -$ | 69,882 | -$ | 167,181 | -$ | 209,299 | -$ | 219,884 | -$ | 214,605 |
| | | | | | | | | | | |
| Year End Principal Balance | | $4,710,130 | | $4,605,786 | | $4,496,648 | | $4,382,497 | | $4,263,102 |
| Principal Paid | $ | - | $ | 104,344 | $ | 109,138 | $ | 114,151 | $ | 119,395 |
| Interest Paid | $ | 211,956 | $ | 209,821 | $ | 205,028 | $ | 200,014 | $ | 194,770 |

**Wolverine Debt Performance Analysis**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Principal Exposure (Principal less reserves) | $ | 4,210,130 | $ | 4,105,786 | $ | 3,996,648 | $ | 3,882,497 | $ | 3,763,102 |
| | | | | | | | **Principal Reduction** | $ | 447,028 |
| | | | | | | | **Principal Exposure Reduction** | $ | 447,028 |
| | | | | | | | **Wolverine Interest Earned** | $ | 1,021,588 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Year End Cash Reserves** | $ | 500,000 | $ | 500,000 | $ | 500,000 | $ | 500,000 | $ | 500,000 |